**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 5:11-cr-00031** |
| | **:** | |
| **ANJAY PATEL** | **:** | |
| | **:** | |

**UNITED STATES' OPPOSITION TO PETITIONER'S RULE 60(d)(3) MOTION AND RENEWED MOTION TO DISMISS**

The United States opposes Anjay Patel's recent motion seeking reconsideration of his amended § 2255 petition (and permission to file another amended petition). Mr. Patel alleges "fraud on the court" under Federal Rule of Civil Procedure 60(d)(3), claiming the government provided false or misleading responses to Mr. Patel's amended § 2255 petition. The government strongly disputes that claim. By and large, the government's brief simply identified the inadequacies of Mr. Patel's claims and highlighted the ongoing timeliness problems. As for the government's few affirmative factual claims, the undersigned has not identified anything that is false or misleading; rather, the claims in the government's prior filings appear consistent with the record. At a minimum, they certainly do not satisfy the difficult and lofty standard necessary to constitute fraud on the court.

Moving past Rule 60(d)(3), much of Mr. Patel's motion sounds in a successive § 2255 petition. But the claims fail to satisfy § 2255's procedural requirements, while, as a substantive matter, the various bits of new information he has scraped

1

together out of the exhibits from a now-defunct civil lawsuit in North Carolina do not provide any basis for relief. The Court should dismiss Mr. Patel's newfound attempt to escape the consequences of his criminal conduct and his duly earned conviction.

## BACKGROUND

Because the Court and the parties are broadly familiar with the relevant context of Mr. Patel's case, the government sets forth a somewhat limited background.

Mr. Patel was indicted in 2011 for trafficking in contraband cigarettes and laundering money. Dkt. No. 3. His indictment stemmed largely from an ATF tobacco-front churning operation in Edinburg, Virgina. ATF operatives, primarily through case agent Eric Flagg, operated a tobacco wholesale business called "Valley Tobacco" and distributed cigarettes. *Id*. Between 2009 and 2011, Mr. Patel bought and sold contraband cigarettes through Valley Tobacco in Edinburg, as well as through a separate tobacco wholesaler in Chantilly, Virginia, operated by Fairfax County law enforcement officers, and laundered money from Valley Tobacco. *Id*.

In February 2013, Mr. Patel pleaded guilty to six counts, including charges for conspiring to distribute contraband cigarettes, trafficking in contraband cigarettes, and engaging in various forms of money laundering. Dkt. No. 490. He was sentenced on August 14, 2013, to 84 months in prison, two years of supervised release, and $2.6 million in restitution. The Court's judgment was entered on

2

august 29, 2013. Dkt. Nos. 625 and 654. He has since been released from prison and has also completed serving the entirety of his supervised-release term.

Following his conviction and sentence, Mr. Patel has brought various challenges to his conviction and sentence. His initial challenge, filed in 2017, was based on a report from the Department of Justice's Office of the Inspector General. *See* Dkt. No. 871, at 37 (Exhibit B to Mr. Patel's first § 2255 petition). OIG had reviewed ATF's tobacco churning operations and produced a report identifying various issues. "Churning" operations are law enforcement activities that generate revenue which is then reinvested into the operation to cover ongoing costs. The tobacco churning operations—i.e., tobacco-distribution business operating as ATF fronts to catch purveyors of untaxed and contraband cigarettes—could generate substantial amounts of money, which had to be stored, accounted for, and reinvested. OIG found that ATF's process for approving the operations was lax; that one operation ("Operation Alpha") was not authorized; that there was inadequate documentation for some expenses; that revenues generated by one operation were improperly transferred to another operation; and that field-level and headquarters-level manages did not adequately supervise or oversee the operations. *See id.* at i-iv (Executive Summary). OIG released the report in September 2013, and it was widely covered in the press.

Mr. Patel relied on the report in petitioning for relief under 28 U.S.C. § 2255 and argued that it amounted to improperly withheld *Brady* material. Dkt. No. 871. The government opposed the petition, arguing that even if it amounted to *Brady*

information (a point which it did not concede), the petition was untimely. Dkt. No. 877. The Court agreed it was untimely. It dismissed the petition after finding that Mr. Patel's request fell well outside § 2255's applicable one-year deadline under— the OIG report issued in September 2013, but Mr. Patel did not raise it until March 2017. Dkt. No. 899.[1]

\* \* \*

Before continuing with Mr. Patel's procedural history, the government pauses to lay out the relevant events and pieces of evidence Mr. Patel has relied on to challenge the propriety of ATF's tobacco churning operations. In particular, he has highlighted a few different items as putative support for his claims, including: ATF's "Big South" churning operation in Bristol, Virginia; a 2017 New York Times article about the "Big South" churning operation; and a civil fraud and racketeering lawsuit in the Eastern District of North Carolina brought against the "Big South" churning operation.

Each of those items warrants a brief summary:

Big South, and later Big Sky, were tobacco churning operations. The operations were overseen by ATF Special Agent Thomas Lesnak and centered around the participation of two longtime cigarette distributors who became confidential informants: Jason Carpenter and Christopher Small. The undercover operation generated substantial revenues and included both legitimate sales of lawful cigarettes and sales of untaxed, contraband cigarettes to criminal targets.

---

[1] Mr. Patel also raised Sixth Amendment claim about his inability to use forfeited funds to retain counsel. That claim was also rejected.

*See U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Virginia, LLC*, 899 F.3d 236, 242-46 (4th Cir. 2018). As Agent Lesnak later explained in a deposition, some of the money generated from Big South, and later Big Sky, was used to "backstop" other ATF operations, meaning the money was used to cover various expenses. *See* Dkt. No. 913-1 (Lesnak Deposition), at 49-51, 337-340.[2]

In September 2017, the New York Times published a story about the "Big South" operation in Bristol: "'I Smell Cash': How the A.T.F. spend Millions Unchecked". The article described the substantial amount of money coming through the operation and the way it was housed in various accounts and used to pay for the ATF's expenses in other investigations and operations.[3]

The civil fraud lawsuit arose out of dispute between the Big South business and U.S. Tobacco Cooperative, a farmer-owned cigarette manufacturer, which purchased Big South in 2011. After the sale, ATF continued its undercover operation with Mr. Small and Mr. Carpenter out of a new business—called "Big Sky"—which was connected to Big South. U.S. Tobacco was aware of ATF's role with Big South and the undercover operations, and, as part of the sales negotiations, it agreed to Mr. Small and Mr. Carpenter's ongoing involvement in ATF's undercover operations through Big Sky. *U.S. Tobacco Coop. Inc.*, 899 F.3d at 245. Nevertheless, in the wake of the sale, U.S. Tobacco sued Big Sky, the prior "Big

---

[2] The cited pages correspond to the underlying pagination of the deposition transcript, rather than the ECF-stamped pagination.

[3] The article is available at <https://www.nytimes.com/2017/09/08/us/atf-tobacco-cigarettes.html>.

5

South" entities, Mr. Small, Mr. Carpenter and others, claiming they defrauded U.S. Tobacco and breached a non-compete agreement that was part of the sale. *See generally*, Case No. 5:13-cv-000527 (E.D.N.C.). The United States was later substituted, under the Westfall Act, as the defendant for certain claims. *U.S. Tobacco Coop., Inc. v. Big S. Wholesale of Virginia, LLC*, 365 F. Supp. 3d 604, 611 (E.D.N.C. 2019). As part of that suit, Agent Lesnak, Mr. Small, Mr. Carpenter, and others were deposed. In addition, the parties generated expert reports and accounting data from Big South's and Big Sky's financial records.

Ultimately, there was never any finding of wrongdoing on Big South's or Big Sky's part. The district court dismissed the claims against the United States and granted summary judgment for the Big South and Big Sky as to U.S. Tobacco's claims. *Id.* at 614-623. Prior to that dismissal, the case passed before the Fourth Circuit in an interlocutory challenge related to the Westfall Act. Notably, the Fourth Circuit described the significance and importance of Mr. Small's and Mr. Carpenter's contributions to ATF investigations, along with the value of Big South's (and later, Big Sky's) undercover work:

> No one disputes the extent and value of Carpenter's and Small's undercover activities over this seven-year period to ATF and to numerous other international, federal and state agencies, or the dangers that the two men subjected themselves and their families to when they conducted these ongoing investigations. [An] ATF Supervisory Special Agent [explained that]:
>
> Carpenter and Small interacted with dozens of targets of criminal investigations. Carpenter's and Small's cooperation was integral to the prosecution of over 100 criminal defendants and forfeiture of tens of millions of dollars. . . .

> While many of the investigations supported by Carpenter and Small targeted white-collar frauds with no history of violent crime, a small but significant group of targets have violent criminal histories, are members of domestic and/or international organized criminal groups, or have ties to corrupt political figures overseas.

*U.S. Tobacco Coop. Inc.*, 899 F.3d at 246.[4] The upshot is that although Mr. Patel seeks to cast a pall upon Big South, for example by referring to "the misconduct at the heart of the U.S. Tobacco I case" and its potential connection to his own investigation *see* Dkt. No. 989-1, at 11, the reality is that there were no findings or judgments of "misconduct" in the U.S. Tobacco case, and the Fourth Circuit actually lauded the efforts of the investigators and, in particular, the Big South informants.

Beyond those incidents and events, Mr. Patel has also cited to the congressional testimony of Acting ATF Director Thomas Brandon, who generally described some of the difficulties and issues with the churning operations.[5] And he also introduced a 2017 OIG Investigative Summary which described a misconduct investigation related to an ATF Resident-Agent-in-charge, and an Assistant U.S. Attorney involved in a churning operation. *See* Dkt. No. 913-1. As the government noted in its response, that investigation likely related to a prosecutor and ATF agent in Georgia. Dkt. No. 913, at 14-16.

\* \* \*

---

[4] U.S. Tobacco also brought FTCA claims against the United States in 2018. *See* Case No. 5:18-cv-473 (E.D.N.C.). That suit was settled in 2020. The undersigned is not aware of any of the terms of the settlement.

[5] The text of Mr. Brandon's testimony is available at: <https://www.congress.gov/event/115th-congress/house-event/105672/text>.

Turning back to Mr. Patel's procedural history:

After the Court dismissed Mr. Patel's initial § 2255 petition as untimely, it gave him permission to file an amended petition to the extent he could identify *Brady* issues that "transcend[ed] the issues raised in the 2013 OIG report." Dkt. No. 899, at 19. Mr. Patel filed an amended petition in February 2019, well after the Court-imposed deadline. Dkt. No. 907. He relied, in particular, on Acting Director Brandon's congressional testimony, the 2017 New York Times article, Agent Lesnak's deposition, and the 2017 OIG Investigative Summary. The government again opposed Mr. Patel's motion, arguing the claims were untimely and did not "transcend" the 2013 OIG report. Dkt. No. 913. The Court dismissed Mr. Patel's late-filed, amended § 2255 petition in June 2019. Dkt. No. 918. The Court found that the issues raised did not give rise to *Brady* claims that were not already time-barred, and they lacked particular connections to Patel's investigation. *Id.*

More than five years later, in December 2024, Mr. Patel filed the currently pending motion under Rule 60(d)(3) motion. He claims there are new, salient facts, and argues the government's prior filings, challenging the timeliness and adequacy of Mr. Patel's amended § 2255 petition, defrauded the Court. Dkt. No. 989-1.

## ARGUMENT

### 1. There was no fraud on the Court

Mr. Patel complains at length in his Rule 60(d)(3) motion about the government opposition briefs in this case, but he fails to muster evidence of any sort

of fraud, much less the sort of egregious and deliberate deception necessary to show fraud on the court.

Fraud on the court, under Rule 60(d)(3), is a notably difficult standard to satisfy. It is "not your garden-variety fraud"; rather, it is "limited to situations such as "bribery of a judge or juror, or improper influence exerted on the court by an attorney, in which the integrity of the court and its ability to function impartially is directly impinged." *Fox ex rel. Fox v. Elk Run Coal Co.*, 739 F.3d 131, 135-36 (4th Cir. 2014) (internal quotation marks omitted). In addition, fraud on the court requires more than just "an intentional plot to deceive the judiciary"; "it must also touch on the public interest in a way that fraud between individual parties generally does not." *Id.* at 136.

Given those lofty parameters, courts have routinely rejected fraud-on-the-court claims, even where they involve perjury or falsified evidence. *See, e.g., Great Coastal Exp., Inc. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 675 F.2d 1349, 1353-57 (4th Cir. 1982) (Perjury, sabotage, and fabricated acts of violence were insufficient "to constitute fraud on the court."); *In re Genesys Data Techs., Inc.*, 204 F.3d 124, 130-132 (4th Cir. 2000) (False affidavit, used to secure a default judgment, was insufficient to show fraud on the court); *id.* ("Fraud between parties, however, is not fraud on the court even if it involves perjury by a party or witness.") (internal quotation marks and brackets omitted).

Part of the reason for such an elevated standard is the courts' interest in finality and the presence of Rule 60(b)(3), which allows a party to seek relief from

judgment, within a year of its entry, in the event of fraud, misrepresentation, or misconduct. Fed. R. Civ. P. 60(b)(3). In effect, litigants may seek relief for so-called ordinary cases of fraud or misconduct, but those issues ought to be raised and litigated in short order, rather than haling litigants back into court years after the underlying dispute has been adjudicated. *Fox ex rel. Fox*, 739 F.3d at 135 ("[A]fter a year, the public's powerful interest in leaving final judgments undisturbed generally triumphs and 'ordinary' fraud will not suffice to set aside a ruling."). *Weathers v. Ziko*, 2015 WL 12763620, at *2 (M.D.N.C. Nov. 6, 2015), *aff'd*, 648 F. App'x 350 (4th Cir. 2016) ("When alleging a claim of fraud on the court, the plaintiff must show by clear and convincing evidence that there was fraud on the court, and all doubts must be resolved in favor of the finality of the judgment.") (quoting *Weese v. Schukman*, 98 F.3d 542, 552 (10th Cir. 1996)). Mr. Patel long ago missed that one-year deadline—his initial judgment was in 2013; his first § 2255 petition was dismissed in December 2018; and his amended petition was dismissed in June 2019. In other words, his December 2024 motion overshot the deadline for any fraud-based Rule 60(b)(3) claim by several *years*. Mr. Patel attempts to justify this tardiness by arguing that certain materials from the U.S. Tobacco litigation were under seal and inaccessible. *See* Dkt. No. 989-1, at 9-10. But as described in more detail below, *see infra*, at 25-26, the materials in his exhibits were unsealed and publicly available in July 2017 and September 2018—i.e., *before* he filed his amended petition. *See* Case No. 5:13-cv-000527, Dkt Nos. 1121 (unsealing order for

email in entry 777-18); 847 (publicly available redacted versions of financial records exhibits).

Ultimately, the government strongly disputes any allegation of fraud—garden-variety or otherwise—but it's important to recognize the disparate and higher standard applicable to Mr. Patel's allegations due to his own tardiness and lack of diligence.

Before turning to particular statements in the government's prior filings, the government notes it is often difficult to discern precisely what conduct or representation Mr. Patel is relying on for his claims here. Many allegations lack cites[6], while for others, the citations don't seem to support the underlying allegation.[7] And it bears noting that there are relatively few affirmative factual pronouncements in the government's prior oppositions. Much of the briefs simply pointed out how Mr. Patel allegations were untimely or he had failed to carry his burden, *see generally* Dkt Nos. 894 and 913—representations that don't exactly

---

[6] *E.g.*, Mr. Patel mentions "the Government's representations that the information published by the New York Times regarding the U.S. Tobacco case was unrelated to his investigation[.]" Dkt. No. 989-1, at 12. But there's no cite supporting that claim. And in reviewing the government's response to the amended petition (Dkt. No. 913), as well as its response to an earlier letter from Mr. Patel (Dkt. No. 894), the undersigned has not found any such representation about the New York Times article. In fact, the response to the amended petition doesn't appear to refer to the New York Times article at all.

[7] *E.g.*, Mr. Patel alleges "[t]he Government denied Patel's allegations" and cites to "ECF No. 913, at 4." *See* Dkt. No. 989-1, at 5. But on that page of the government's motion to dismiss, it simply lists Patel's claims. Nowhere on that page does the government deny those claims. That doesn't mean the government simply conceded them, but in responding to a claim as serious as fraud on the court, it's difficult to wrestle with allegations that are so inartfully pled.

11

provide much grist for a fraud claim, much less the sort of system-destabilizing conduct necessary to show fraud on the court. Even reviewing the highlighted portions of the government's brief (attached as an exhibit to the motion for reconsideration), they often relate simply to summaries of Mr. Patel's claims, or arguments that the claims are untimely or lack adequate factual allegations. *See* Dkt. No. 989-2, at 62-79.

That said, the government has identified at least a few particular statements that are either specifically identified (in the Court's order and Mr. Patel's motion) or otherwise constitute affirmations of fact and so may be a basis for Mr. Patel's claims:

- "Lesnak was not part of an unauthorized operation." Dkt. No. 913, at 14.

- "[T]he investigation into Patel's cigarette trafficking scheme is plainly not the 'Operation Alpha' referred to in the 2013 OIG report, and Patel has pointed to no other evidence to suggest otherwise." *Id.* at 9, n.5.

- "Lesnak's substantive testimony relates to the 2013 report—which the Court has ruled is substantively time barred—and to matters unrelated to this case." *Id.*

- "Brandon's testimony does not appear to contain any references to the investigation of Patel's criminal conduct." *Id.*, at 13.

- The collection of statements arguing the 2017 OIG Summary relates to an agent and a prosecutor in Georgia, not Agent Flagg or prosecutor Sharon Burnham. *Id.* at 14-15.

- "Patel's 'new' allegations of connections to the 2013 OIG report are factually baseless, and fail to show any connection to the investigation into his criminal conduct." *Id.* at 9.

*See also* Dkt. No. 997, at 5-6; Dkt. No. 989-1, at 5-6.

None of these statements or representations amount to fraudulent, and they do not justify relief under Rule 60(d)(3).

Beginning with the statement that "Lesnak was not part of an unauthorized operation[,]" the undersigned is still unaware of any evidence that Agent Lesnak was part of an unauthorized operation. Mr. Patel claims he has evidence showing otherwise, but his evidence doesn't hold up. He argues that the unauthorized "Operation Alpha" described in the 2013 OIG Report was the "Superior Wholesale" churning operation in Charlotte, North Carolina; however, he then claims that "Target A" was also a reference to "Operation Alpha," and the Agent Lesnak was the case agent for "Target A." *See* Mot. at 18-19. That second leap (equating "Operation Alpha" with "Target A") is pretty obviously wrong: "Target A" is a *target* of investigation, not a churning operation; in fact, other portions of Agent Daniel Whittemore's deposition testimony (which is part of what Mr. Patel relies upon) make clear that Target A was an investigative target living overseas that Mr. Small and Mr. Carpenter actually visited, not a tobacco-distribution business in North Carolina. *See* Gov't. Ex. 1, at 9-10.

Moreover, even if there were something to Mr. Patel's unsupported claims, it is hardly fraud on the court for the government to make a representation relying on

13

Agent Lesnak's sworn testimony, particularly as it relates to a different churning operation and a different target than those at issue in Mr. Patel's case. *See* Dkt. No. 913, at 14 (citing Agent Lesnak's deposition). Indeed, it falls well short of "bribery" or "improper influence" or an "intentional plot to deceive the judiciary," *Fox ex rel. Fox*, 739 F.3d at 136, and is more akin to the sort of evidentiary dispute that is decidedly not sufficient to state a Rule 60(d)(3) claim, *Cleveland Demolition Co. v. Azcon Scrap Corp., a Div. of Gold Fields Am. Indus.*, 827 F.2d 984, 987 (4th Cir. 1987).

Relatedly, as to the second statement about "Operation Alpha" and "Valley Tobacco," Mr. Patel appears to have abandoned his earlier notion that "Valley Tobacco" and the investigation into his criminal exploits was "Operation Alpha"; he now argues that it was actually "Superior Wholesale." *Compare* Dkt. No. 871, at 35 and Dkt. No. 989-1, at 18-19. That concession is perhaps unsurprising since there was never any compelling evidence to begin with that "Operation Alpha" was "Valley Tobacco." But the more important point is that there is no longer any claim that "Valley Tobacco" is "Operation Alpha," and thus there is necessarily no fraud in the government denying as much.

Next, moving to the third and fourth representations—i.e., that Acting Director Brandon's testimony "does not appear to contain any references" to Mr. Patel's case, while Agent Lesnak's testimony dealt with matters "unrelated to" Mr. Patel's case—there is, yet again, no fraud. The undersigned has reviewed the testimony for both Acting Director Brandon and Agent Lesnak; neither of them

14

appear to contain any specific references to Mr. Patel, Valley Tobacco, case agent Eric Flagg, Edinburg, Chantilly, or Fairfax County's churning operation (where Mr. Patel was also active). So in that sense, the government's prior representations seem correct—the testimony is unrelated, and lacks references, to Mr. Patel's case. And to the extent Acting Director Brandon and Agent Lesnak spoke in a broader sense about issues with churning operations, that appears to be in line with the 2013 OIG Report (which Mr. Patel waited too long to raise) rather than anything specific to Mr. Patel's case. It is not fraud on the court—as in, it does not "directly impinge[] the Court's "ability to function impartially[,]" *see Fox ex rel. Fox*, 739 F.3d at 136—for the government to suggest a deponent's testimony is unrelated to an investigation and a target the deponent never mentions.

Turning to the 2017 OIG Investigative Summary, there is no fraud in representing that the summary deals with an agent and prosecutor in Georgia, rather than Agent Flagg or Sharon Burnham. Mr. Patel has produced absolutely no proof of this allegation—particularly since the exhibits showing Ms. Burnham is no longer an active bar member don't actually substantiate his claims. And he has now seemingly abandoned it (given that there's no mention of the issue in his most recent filing). That rank speculation on Mr. Patel's part, smearing law enforcement officers and prosecutors for no reason other than a vain attempt to excuse his own criminal malfeasance, does not lend itself to any sort of fraud-on-the-court claim against the government. Indeed, far from defrauding the Court, the government's discrediting of those claims, by providing the relevant information and evidence

about the individuals likely described in the report, pointed toward to the proper conclusion that Mr. Patel's claim was wholly specious.

And regarding the last representation listed above, there is no fraud in the government noting that Mr. Patel failed to offer any more specific connections between the 2013 OIG report and his case. Indeed, the primary argument Mr. Patel relied on to connect his case to the specific problems set forth in the report was his insistence that "Valley Tobacco" was "Operation Alpha." *See* Dkt. No. 907, at 3-7. Yet, as described above, he's now abandoned that claim, meaning the government can hardly be faulted for contesting it in the first place. Moreover (and as described above), the additional sources he relied on in his amended petition—e.g., Acting Director Brandon's congressional testimony, Agent Lesnak's deposition testimony, the New York Times article about Big South, and the 2017 OIG Investigative Summary—did not specifically discuss Mr. Patel's case, tie it to any particular foibles identified in the 2013 OIG report, or otherwise identify any accounting or operational faults specifically in Mr. Patel's case.

Finally, the government notes that not only does any Rule 60(d)(3) claim based on these statements fail because the statements are neither false nor fraudulent—nor (even if they were) would they be sufficiently egregious and intentionally deceptive to constitute fraud on the court—it also fails because putative fraud related to a dispute about Mr. Patel's conviction alone (and whether any monetary sanctions he faces ought to be altered) does not "touch on the public interest[.]" *Fox ex rel. Fox*, 739 F.3d at 136. Mr. Patel's case is a far cry from the

16

Supreme Court's foundational Rule 60(d)(3) decision in *Hazel-Atlas*, which involved the potential monopoly of patent rights that would impact both competitors and an entire consumer base. *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944). Mr. Patel's challenges, by contrast, affect only him, touching only on whether he may receive some relief from punishments imposed for clear criminal activity that he ultimately acknowledged under oath.

Mr. Patel suggests that any case involving government lawyers touches on the public interest because government attorneys "operate under heightened ethical obligations[.]" Dkt. No. 989-1, at 21. It is certainly true (and appropriate) that prosecutors often bear greater scrutiny and heightened expectations, but that does not turn every individual criminal or habeas case into a matter of public interest. By that logic, *every* error in *every* case would touch on the public interest because there is a general public interest in the fair and equitable operation of the court system, both civilly and criminally, and the specific, narrowing requirement for Rule 60(d)(3) claims would be entirely meaningless. The reality is that the only person ultimately impacted by these proceedings is Mr. Patel himself, so this particular dispute is not one for which the extreme remedy of Rule 60(d)(3) is proper. *Fox ex rel. Fox*, 739 F.3d at 136 (highlighting, for purposes of describing the "public interest" requirement, that *Hazel-Atlas* 'involve[d] far more than an injury to a single litigant'") (quoting *Hazel-Atlas*, 322 U.S. at 246).

Similarly, there should be no confusion between any public interest that may exist about, on the one hand, the 2013 OIG report and ATF's churning operations

17

and, on the other, the particular questions the Court would address in *this* case—

i.e., whether there was *Brady* information that should have been disclosed; whether

a § 2255 *Brady*-based claim was properly pled and preserved; and whether errors

would entitle Mr. Patel to relief. The nuanced, case-specific *Brady* questions here do

not become matters of public interest within the meaning of Rule 60(d)(3) simply

because the earlier, general reporting about ATF was a matter of public interest.

At bottom, the government did not carry out any sort of fraud on the Court.

The government's representations hewed to the record and available evidence in the

case. Mr. Patel has not met the "very high bar" for proving fraud on the court, and

his motion for relief under Rule 60(d)(3) should be denied.

* * *

**2. Mr. Patel's new information does not provide a basis for § 2255 relief; if the motion were to be construed as a successive § 2255 petition, it should be dismissed**

Mr. Patel does not expressly request habeas relief on the basis of additional

information he's gleaned from U.S. Tobacco's failed lawsuit—ostensibly, he seeks

only Rule 60(d)(3) relief and reconsideration of the court's earlier denial. But the

nature of his claims sound in a successive § 2255 claim. *See Gonzalez v. Crosby*, 545

U.S. 524, 531, (2005) (explaining that a Rule 60(b) motion seeking "leave to present

'newly discovered evidence,' . . . in support of a claim previously denied" was a

successive habeas claim). To the extent the Court similarly construes his

allegations, the government preemptively disputes the propriety of any § 2255 relief

on the "new" information here and moves to dismiss any such claim.

18

## A. Mr. Patel's changing allegations

At the outset, it bears noting the trajectory of Mr. Patel's allegations and, more importantly, how they've mutated over time to accommodate his ongoing quest to escape the consequences of his criminal conduct.

For example, Mr. Patel initially insisted that Valley Tobacco was the "Operation Alpha" described in the 2013 OIG report, and he continued to insist as much through his amended § 2255 petition. *See* Dkt. No. 871, at 35 ("I do not believe there is any question that my investigation is Operation Alpha in the OIG's Report."); Dkt. No. 907, at 5. Notably, he never had any evidence to support that claim (and the available evidence indicated otherwise, *see* Dkt. No. 913, at 9 n.5); but he argued it anyway because he believed it might help his cause. Now, as noted above, he says "Operation Alpha" was something different—i.e., Superior Wholesale. Yet at no point has he acknowledged the error or impropriety or sheer speculation of his prior claim. He simply presses forward with whatever factual allegations suit his newest ideas.

Similarly, he argued the individuals described in the 2017 OIG Investigative Summary were Sharon Burnham and Agent Flagg (or Agent Swann or Agent Lesnak). *See* Dkt. No. 907, at 15-21. He had no meaningful supportive evidence. Indeed, all he could point to was the fact that Ms. Burnham had retired and was no longer an active member of the bar (which was hardly proof that she had engaged in any sort of misconduct). *Id.* at 17. Now that the government has countered that claim (and the Court recognized Mr. Patel's allegation was "utter speculation"), *see*

19

Dkt. No. 913, at 14-16; Dkt. No. 918, at 9-10, he no longer mentions the 2017 OIG Report. But once again, he never acknowledges his error, or his willingness to baldly defame law enforcement officers. He simply flits along to the next claim. The upshot is pretty clear: Mr. Patel is not interested in the truth; he just wants a legal hook to hang his hat on.

**B. Mr. Patel's new allegations are insufficient to warrant relief**

In the context of a habeas challenge following a guilty plea, a defendant bears the burden of showing his plea was involuntary on account of the government's putative misconduct. *United States v. Fisher*, 711 F.3d 460, 467 (4th Cir. 2013). Not any misconduct will do—it must "strike[] at the integrity of the prosecution as a whole." *Id*. at 466. And the "Defendant must show a reasonable probability that, but for the misconduct, he would not have pleaded guilty and would have insisted on going to trial." *Id*. at 467.

Here, Mr. Patel points to a couple of salient pieces of evidence: (1) an email between Agent Flagg and Mr. Small, indicating Mr. Small (through Big South) covered part of Agent Flagg's operational expenses, *see* Dkt. No. 989-2, at 115; and (2) an expert report that combined the raw data from multiple Big South accounts and show occasions where money was credited to Valley Tobacco, including in some instances to cover particular expenses, *see*, *e.g.*, Dkt. No. 989-2, at 135, 163-164. In effect, the evidence shows that some money passed between Big South and Valley Tobacco.

20

The government acknowledges that this is inconsistent with federal funding laws for law enforcement operations, as explained in the 2013 OIG Report. *See* Dkt. No. 871, at 58 (2013 OIG Report, pg. 14). The appropriate practice would be for Valley Tobacco's funding to come from appropriate Department-of-Justice funds or revenue it generated on its own. *Id*. But even assuming this would constitute *Brady* information[8], it does not provide a basis for relief. Mr. Patel pled guilty. So he must do more than show the possibility that undisclosed *Brady* or *Giglio* material may exist. He must meet the exacting standard of showing that undisclosed material creates a reasonable probability that, had he known about the material, he would have proceeded to trial.

He cannot satisfy that burden.

***First***, none of this information exculpates Mr. Patel. It does not suggest that he did not willingly purchase and resell contraband cigarettes over and over again, or that he did not launder money generated by contraband tobacco sales. It does not change the underlying facts that, separate and apart from Valley Tobacco, Mr. Patel sought to import contraband cigarettes from China; that he sought to acquire and sell other drugs (like cocaine); or that he created fake passports to protect himself. Dkt. No. 569, at 5-11. It does not alter or affect a single word of the statement of facts he signed and adopted under oath. *See* Dkt. No. 491. Simply put, money passing between Big South and Valley Tobacco does not materially alter the proof of Mr. Patel's guilt. So there is no reasonable probability that simply knowing about it

---

[8] The government does not concede that information about money passing between Valley Tobacco and Big South amounts to *Brady* information.

(along with the prospect of questioning Agent Flagg about it) would have impacted his decision to plead guilty.

Indeed, as the Court recognized at Mr. Patel's sentencing (in light of Mr. Patel's counsel's representations) "he was never really going to trial" and was always going to plead guilty. *See* Dkt. No. 972 (Tr. of Sent. H'rg.) at 13-14.[9] And Mr. Patel's counsel similarly argued that he sought to cooperate with the government nearly from the outset, and the delay in pleading guilty simply amounted to the parties getting bogged down in a forfeiture dispute. *Id.* at 13, 29-32, 43. In effect, Mr. Patel was never on the cusp of going to trial, swayed only because he lacked the means to challenge Valley Tobacco's funding apparatus. He sought a plea deal because the evidence clearly pointed to his guilt, and the only issue he disputed with the government was how many assets he would be obligated to forfeit on account of his crimes.

Nor would it have altered the calculus of his restitution, money judgment, or asset forfeiture. Although Mr. Patel has elsewhere argued that the government couldn't prove the amount of contraband cigarettes he bought, his support for that argument was the since-abandoned claim that Valley Tobacco was "Operation Alpha". Dkt. No. 871, at 29-31. Agent Flagg, in the information provided to the Grand Jury and to Mr. Patel's counsel, detailed with specificity that number of

---

[9] *See also id.* at 43-44 ("[Mr. Patel's Counsel:] We didn't file one pretrial motion that went to trial. All of our pretrial motions dealt with what, Judge? Mon[ie]s back, forfeiture issues. There was not one pretrial motion to be filed with the court that indicated a trial strategy. Not one. That should say something about where Mr. Patel stood and where we stood.")

contraband cigarettes and laundered money attributable to Mr. Patel. *See, e.g.*, Dkt. No. 871, at 29-30. And nothing about the fact that money passed between Big South and Valley Tobacco calls that into question. Indeed, the fact that the ATF's Valley Tobacco operation covered expenses with money from another ATF tobacco operation, rather than relying solely on appropriated Department of Justice funds or Valley-Tobacco-derived income, does not show a failure of record-keeping on Valley Tobacco's part. It would not have impacted or altered Mr. Patel's decision to agree to the plea agreement in this case, or the ultimate amounts of restitution and forfeiture ordered by the Court.

**Second**, because the information does not exculpate Mr. Patel or otherwise tend to show his innocence, it is, at most, impeachment information. *See, e.g.*, *United States v. Bagley*, 473 U.S. 667, 676 (1985).[10] Yet the absence of impeachment information does not impact the voluntariness of a plea, and the government is not obligated to disclose impeachment information prior to a guilty plea. *United States v. Ruiz*, 536 U.S. 622, 629-33 (2002) ("These considerations, taken together, lead us to conclude that the Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant."). Indeed, requiring disclosure of impeachment evidence is designed "to preserve the fairness of a trial verdict and to minimize the chance that an innocent person would be found guilty." *United States v. Moussaoui*, 591 F.3d 263, 285 (4th

---

[10] *See also* Dkt. No. 989-1, at 13 (noting the information about funding irregularities would have "allowed [Mr. Patel] to impeach multiple Government witnesses regarding its entire investigation[.]").

Cir. 2010). But "[w]hen a defendant pleads guilty"—as Mr. Patel did—"those concerns are almost completely eliminated because his guilt is admitted." *Id*.

Accordingly, since the government wasn't obligated to provide this impeachment information in the first place, it never would have been a basis for Mr. Patel choosing to go to trial rather than taking a plea. Put differently, there's no "misconduct" because the undisclosed information was not something the government would have been obligated to disclose in the absence of a trial, so there is no basis for finding Mr. Patel's plea involuntary or for providing any relief.

**C. Mr. Patel's new allegations are procedurally inadequate**

Even aside from the substantive failures in Mr. Patel's new motion, there are significant procedural roadblocks to treating it as, in effect, a new § 2255 and appraising its merits.

***First***, Mr. Patel already filed a § 2255 petition, meaning that if his new motion is construed as a § 2255 petition, it's necessarily a second or successive petition. Yet, to be viable, a successive § 2255 petition must be certified by the Fourth Circuit (which has not occurred here). *See* 28 U.S.C. § 2255(h). And it must contain either (1) "newly discovered evidence" sufficient to show that "no reasonable factfinder would have found the movant guilty"; or (2) an argument based on a "new rule of constitutional law" from the Supreme Court. *See* 28 U.S.C. § 2255(h)(2). Mr. Patel's arguments about funding from Big South to Valley Tobacco satisfies neither requirement. In particular, as described above, it does not provide any suggestion that Mr. Patel is not guilty—and it's particularly inadequate (under the rubric of

24

§ 2255(h)) given that Mr. Patel pleaded guilty and agreed, under oath, to a sworn statement of facts establishing his guilt. *See* Dkt. No. 491.

*Second*, § 2255 petitions must be filed within a year of the relevant facts being known or discoverable—a requirement that doomed Mr. Patel's earlier petitions. *See* 28 U.S.C. § 2255(f)(4); *see also* Dkt. Nos. 899 and 918. But the information about Big South's financials, and money going to Valley Tobacco, long preceded Mr. Patel's December 2024 motion for 60(d)(3) relief. The email between Mr. Small and Agent Flagg was unsealed on September 27, 2018. *See* Case No. 5:13-cv-000527, Dkt Nos. 777-18 (emails) and 1121 (unsealing order). And the financial record exhibits attached to the defendants' (i.e., Big South and Big Sky) expert report were posted, in the currently available, redacted form, on July 7, 2017. *See* Case No. 5:13-cv-000527, Dkt Nos. 456 (initial sealed motion with exhibits) and 847 (redacted exhibits).

Mr. Patel suggests that financial data in entry 456 was not actually made available on July 7, 2017, through entry 847, and that, given the docket's text for entry 847, it remained available only to the case participants. However that makes little sense in light of the court particular order directing the parties to file redacted versions of the financial data in entry 456—if that material was to remain sealed (and available only to the parties), there would be no need for redactions. Case No. 5:13-cv-000527, Dkt No. 823 (directing the parties to file redacted versions of entry 456, among other filings). Instead the language about availability in entry 847 is likely just a reference to who can see entry 456. After all, the language in entry 847

mirrors the language about availability in entry 456 and appears to have been incorporated wholesale since entry 847 refers to the "PROPOSED SEALED MOTION" of entry 456. Moreover, there appears to be no later motion altering the availability of entry 847, further indicating that the unsealing order in entry 823 and the redacted posting in 847 made the material publicly available.

Accordingly, if Mr. Patel's motion is construed as a new § 2255 petition, it is procedurally inadequate and should be dismissed.

## CONCLUSION

For all of the foregoing reasons, Mr. Patel's motion fails. He falls well short of the high bar necessary to substantiate a Rule 60(d)(3) motion for fraud on the Court. And if his new information and allegations are construed as a successive § 2255, it should be dismissed. It cannot satisfy the necessary procedural requirements and is substantively inadequate.

Respectfully submitted,

ROBERT N. TRACCI
Acting United States Attorney

/s/ Jonathan Jones

Jonathan Jones
Assistant United States Attorney
United States Attorney's Office
310 1st Street SW, Suite 906
Roanoke, VA 24011
(540) 857-2250
jonathan.jones2@usdoj.gov

26

**CERTIFICATE OF SERVICE**

I certify that on February 2, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to counsel of record.

/s/ Jonathan Jones
Assistant United States Attorney

27