# Exhibit 1



**HIGHLY CONFIDENTIAL**

Transcript of **Daniel P. Whittemore**

**Date:** March 24, 2016

**Case:** US Tobacco Cooperative Inc., et al. -v- Big South Wholesale of VA, et al.

Planet Depos
Phone: 888-433-3767
Fax: 888-503-3767
Email: transcripts@planetdepos.com
Internet: <www.planetdepos.com>

Worldwide Court Reporting | Interpretation | Trial Services

Highly Confidential Videotaped Deposition of Daniel P. Whittemore
Conducted on March 24, 2016

86

Q.    Okay.   Did they seem to have specific concerns about the churn account that we've been talking about today?

A.    No.   As a matter of fact, the -- the OPR auditor had -- he made a comment that because there were so many accounts around the country, and every office or every group did it a different way, he -- he made the comment that we should be the model for the way the churning accounts are accounted for.   In other words, he complimented us on our accounting on the churning account during the time of their audit.

The OIG, my -- my specific conversation to the OIG was about something separate from the churning account.   Had literally nothing to do with monies in the churning account; had more to do with a -- with a vehicle -- or two vehicles, actually.

Q.    Were those vehicles that were being leased?

A.    No.

Q.    To your knowledge, has the ATF ever generated proceeds to further an investigation by selling to an entity that was never considered a target?

A.    To my knowledge, I don't specifically

10:59:49
10:59:54
10:59:56
10:59:57
11:00:04
11:00:09
11:00:15
11:00:21
11:00:23
11:00:26
11:00:29
11:00:33
11:00:35
11:00:39
11:00:44
11:00:49
11:00:52
11:00:57
11:00:59
11:01:00
11:01:22
11:01:24
11:01:26
11:01:29
11:01:31

Highly Confidential Videotaped Deposition of Daniel P. Whittemore
Conducted on March 24, 2016

102

A.    Yes, it's my understanding he did.    11:27:43

Q.    Do you know whether he would introduce other undercover agents to targets?    11:27:47 11:27:49

A.    Yes.    11:27:52

Q.    Would he purchase vehicles on behalf of the ATF?    11:27:54 11:27:55

A.    I don't specifically know of an instance in which he purchased a vehicle on behalf of the ATF.    11:28:02 11:28:04 11:28:06

Q.    Okay.  Do you know what the term "backstopping" means?    11:28:07 11:28:12

A.    Sure.    11:28:14

Q.    Okay.  What's your understanding of that term?    11:28:14 11:28:15

A.    It's basically providing a cloak for undercover agents to work under, to include, you know, company affiliation; verification of identity -- fictitious identity -- in this case, providing of vehicles that were registered to a legitimate company, as opposed to either being not on file, which is a typical law enforcement response to having an undercover vehicle, or it actually being able to be tracked back to a -- to a federal agency through running a tag.    11:28:16 11:28:20 11:28:26 11:28:31 11:28:35 11:28:42 11:28:45 11:28:48 11:28:53 11:28:56

Q.    Was Mr. Carpenter engaged in backstopping?    11:29:00

Highly Confidential Videotaped Deposition of Daniel P. Whittemore
Conducted on March 24, 2016

132

A.   Well, names of targets, names of CIs, location -- specific locations, names of companies; that sort of thing.  Operational security concerns.

Q.   You said another thing you all discussed was how deep you wanted to get into certain subjects.  Was there any discussion of how deep to get into the subject of what Mr. Carpenter and Mr. Small were doing to help generate funds on behalf of the ATF?

A.   I'm certain I didn't go into that.  It was -- it was more along the lines of, you know, these guys are assisting us and others on a number of levels, in a number of investigations across the country, number of agencies, et cetera, and their assistance is -- I recall calling it "sole source," in that -- and the meaning of that was that they were the only source that we had to provide what they were providing.

Specifically, the backstopping, which I can't overemphasize the importance of that to an op- -- to any operation.  But at one time, they were backstopping multiple operations that were related to ours through the use of insurance and company names and vehicle registrations, vehicle insurances, actually the providing of vehicles, et cetera.

12:57:16
12:57:20
12:57:24
12:57:38
12:57:41
12:57:44
12:57:47
12:57:49
12:57:52
12:57:58
12:58:00
12:58:03
12:58:06
12:58:09
12:58:14
12:58:21
12:58:25
12:58:27
12:58:30
12:58:32
12:58:35
12:58:39
12:58:42
12:58:47
12:58:52

Highly Confidential Videotaped Deposition of Daniel P. Whittemore
Conducted on March 24, 2016

134

Q.    Okay.  You said that headquarters had created the posters for you?

A.    Mm-hmm.

Q.    Did you specifically ask headquarters to create these posters for this meeting you were attending?

A.    No.  They -- what happened was, we -- at one time, Agent Lesnak and myself and RAC, which is the resident agent in charge -- the boss -- were the only ones working tobacco.  And Tom was full-time; I was pretty much full-time at the time; and the RAC was just as needed, which we needed him more than he helped, but because of his other duties, he couldn't.

So the case got so big -- in other words, Bristol became kind of the information center for all things tobacco.  And, moreover, the warehouse that Chris and Jason operated, and other warehouses, became the quasi national warehouse for ATF.

And we had proposed on more than one occasion to multiple people within the bureaucracy that two things needed to happen at the headquarters level.  One was, they need -- they needed at least one national warehouse, preferably three, to service the country.  And the other was to have a

Highly Confidential Videotaped Deposition of Daniel P. Whittemore
Conducted on March 24, 2016

139

your case -- they were providing sole-source    13:06:30

services for our operation, as well as other    13:06:34

operations around the country, to include other    13:06:36

agencies.  And I went into a little bit of the    13:06:40

history.  I talked about the need for their    13:06:43

continued participation until some point which I --    13:06:48

you know, I couldn't determine when.  And that was    13:06:52

pretty much it.    13:06:56

        I did -- I do recall asking for questions;    13:06:58

and if there were any questions, there were only a    13:06:59

couple, and it wasn't anything that was significant    13:07:02

enough for me to remember.    13:07:06

    Q.   When you described Mr. Carpenter and    13:07:08

Mr. Small's history with ATF, what specifically did    13:07:10

you tell everybody about their history?    13:07:13

    A.    Told everybody that they were -- they had    13:07:15

been and continued to assist us in ongoing    13:07:17

operations that are -- that were and are critical to    13:07:20

the success of a number of investigations.    13:07:25

    Q.   Did you get into any detail as to how they    13:07:28

assisted with ATF operations?    13:07:31

    A.    I don't recall how specific I got.  I'm    13:07:35

sure it was more than what I just told you.  But,    13:07:37

again, having -- having been three or four years    13:07:41

ago, I don't remember verbatim what I told the    13:07:44

Highly Confidential Videotaped Deposition of Daniel P. Whittemore
Conducted on March 24, 2016

186

A.   Yes.

Q.   -- two years earlier, in Raleigh, at that meeting at which you presented?

A.   Yes, sir.

MR. MARSHALL:  Objection.  Outside the scope of direct.

MR. PARSONS:  Oh, please.

MR. MARSHALL:  It's a proper objection.

MR. PARSONS:  That's absurd.

BY MR. PARSONS:

Q.   Let's see.  For purposes of the practical support of the operation, was what Mr. Carpenter and Mr. Small were doing for ATF and the other agencies that they supported pretty much equal in importance?

MS. POCKLINGTON:  Object to form.

A.   Yes, in a general way.  I mean, some things were more important than others.  But in a general way, everything that they were doing was -- was very important to law enforcement and to the benefit of a number of operations.

Q.   Was everything, that you were aware of, Mr. Carpenter was doing in his interaction with you authorized and approved by someone in law enforcement with the federal government?

A.   Yes --

Highly Confidential Videotaped Deposition of Daniel P. Whittemore
Conducted on March 24, 2016

187

MR. MARSHALL: Object to form.

A. -- everything that I'm aware of, yes.

Q. Same question as to Mr. Small.

A. Yes.

Q. Okay. It was critical to the success of the operations they were asked to assist with; right?

A. Yes, sir.

Q. Were Mr. Carpenter and Mr. Small's activity closely monitored by their case agents and ATF?

A. Yes.

Q. Now, talking briefly about Target A, was the work of Mr. Carpenter and Mr. Small involving Target A done under strict oversight from ATF?

A. Yes and no.

Q. Tell me about that.

A. Well, when they traveled internationally, they were on their own.

Q. Mm-hmm.

A. They -- they went above and beyond the call by visiting Target A at his residence and in other places in his country of residence.

So, you know, while we -- they -- they were being monitored as best as possible from the

Highly Confidential Videotaped Deposition of Daniel P. Whittemore
Conducted on March 24, 2016

188

United States, I mean, it is what it is.  They were on their own when they were in-country.

Q.   But, again, was that at the behest --

A.   Oh, absolutely.

Q.   -- of federal law enforcement?

I'm sorry?

A.   Absolutely, yes.  I'm just saying that what they did wasn't able to be monitored, which -- which made it vitally important that they were able to complete their mission while over there.  And we had-- you know, we had the faith in them that they would, and we, obviously, were hopeful that they would remain in the good graces of Target A and his entourage while they were there.

Q.   Okay.  Just to be crystal clear, when they went in-country at the behest of federal law enforcement, that was not some personal lark or vacation for them; they were doing federal law enforcement's business; is that right?

A.   That's correct.

Q.   Do you have personal knowledge of Mr. Carpenter's reputation in the law enforcement community for truthfulness?

A.   Yeah.  It's impeccable.

Q.   Same question as to Mr. Small.

Highly Confidential Videotaped Deposition of Daniel P. Whittemore
Conducted on March 24, 2016

189

A.    Same.    14:19:47

Q.    Do you know Mr. Carpenter's character for honesty and truthfulness personally?    14:19:47 / 14:19:51

A.    Yeah.  I mean, in the years that I've been around him, he's -- he's literally salt of the earth.  He's of high moral standard, high-caliber man.    14:19:54 / 14:19:56 / 14:19:58 / 14:20:02

Q.    Same question as to Mr. Small.    14:20:02

A.    Same.    14:20:05

Q.    Okay.    14:20:06

Did you have any sense or impression, after you finished your involvement with the March 23rd, 2011, meeting, that any of the attendees seemed perplexed or mystified as to why this meeting had even taken place?    14:20:21 / 14:20:25 / 14:20:27 / 14:20:33 / 14:20:37

MS. POCKLINGTON:  Objection to form --    14:20:39

MR. MARSHALL:  Object to the form.    14:20:41

MS. POCKLINGTON:  -- and speculation.    14:20:41

MR. KELLY:  You can answer.    14:20:43

A.    Not at all.  As a matter of fact, it was the opposite.  Everybody appeared to be adequately informed.  And, again, I did ask for questions, you know, if I didn't, you know, state things clear enough or whatever.  And I -- I do recall saying that, you know, there was a possibility that a    14:20:44 / 14:20:46 / 14:20:50 / 14:20:53 / 14:20:58 / 14:21:03